IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ESTATE OF AMELIA H. MACIAS, WALTER MACIAS, STEVEN MACIAS, YVONNE SHILLING, INDIVIDUALLY AND AS A REPRESENTATIVE OF THE ESTATE OF AMELIA H. MACIAS; | § § § § § § | |
| *Plaintiffs,* | § § | |
| vs. | § § | |
| TEXAS DEPARTMENT OF PUBLIC SAFETY, VERONICA GIDEON, TEXAS DPS OFFICER, INDIVIDUALLY; ELIAS ESCALON, TEXAS DPS OFFICER, INDIVIDUALLY; NATHAN MUTZ, TEXAS DPS OFFICER, INDIVIDUALLY; DREW PILKINGTON, TEXAS DPS OFFICER, INDIVIDUALLY;  TEXAS DEPARTMENT OF ADULT PROTECTIVE SERVICES, BRANDI WEIMER, ADULT PROTECTIVE SERVICES AGENT, INDIVIDUALLY; HENRY L. WHITMAN JR., COMMISSIOER OF ADULT PROTECTIVE SERVICES; JOSEPH EVANS, TEXAS DPS OFFICER, INDIVIDUALLY; JASON BOBO, TEXAS DPS OFFICER, INDIVIDUALLY; BRENT BARINA, TEXAS DPS OFFICER, INDIVIDUALLY; CHAD MATLOCK, TEXAS DPS OFFICER; CODY MITCHELL, TEXAS DPS OFFICER, INDIVIDUALLY; MICHAEL J. SMITH, TEXAS DPS OFFICER; STEVEN MCCRAW, DIRECTOR OF TEXAS DEPARTMENT OF PUBLIC SAFETY; CRYSTALYNN NICHOLE CORNEVIN, ADULT PROTECTIVE SERVICES AGENT;  STATE OF TEXAS, KEZELI WOLD, &QUOT;KEZ&QUOT; DIRECTOR OF TEXAS DEPARTMENT OF FAMILY SERVICES; AND DEPARTMENT OF FAMILY PROTECTIVE SERVICES, | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | SA-20-CV-00460-FB |
| *Defendants.* | § | |

1

# REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

**To the Honorable United States District Judge Fred Biery:**

This Report and Recommendation concerns the following motions to dismiss: Defendants' Motion to Dismiss for Lack of Capacity or, in the Alternative, for Failure to Join Necessary Parties [#9]; Defendants DPS, Gideon, Escalon, Mutz, and Pilkington's Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) [#11]; Defendant Bobo's Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), 12(b)(7), 12(h)(2), and 19(a) [#12]; Defendants Texas Department of Family Protective Services, Henry L. Whitman, and Brandi Weimer's Motion to Dismiss Plaintiffs' Second Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6) [#26]; Defendant McCraw's Motion to Dismiss with Brief in Support [#41]; Defendant Crystalynn Nichole Cornevin's Motion to Dismiss Plaintiffs' Second Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(1), 12(b)(4), 12(b)(5), and 12(b)(6) [#42]; Defendants Matlock, Barina, Mitchell, and Smith's Motion to Dismiss with Brief in Support [#43].

All dispositive pretrial matters in this case have been referred to the undersigned for disposition pursuant to Western District of Texas Local Rule CV-72 and Appendix C [#6]. The undersigned therefore has authority to enter this recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). In evaluating the merits of Defendants' motions, the Court has also considered the following responses and replies: Plaintiffs' Responses [#13, #17, #29, #44, #45, #46] and Defendants' Replies [#39, #47]. For the reasons set forth below, it is recommended that Defendants' Motions to Dismiss [#11, #12, #26, #41, #42, #43] be **GRANTED IN PART** as set forth herein. In short, the District Court should dismiss Plaintiffs' federal causes of action arising under 42 U.S.C. § 1983 and remand the remaining wrongful death, survivorship, and

2

negligence claims to state court.  It is further recommended that Defendants' Motion to Dismiss for Lack of Capacity or, in the Alternative, for Failure to Join Necessary Parties [#9] be **DISMISSED WITHOUT PREJUDICE** to refiling in state court.

## I.  Factual and Procedural Background

This civil rights action arises out of the tragic death of Amelia Macias on March 6, 2018, during an encounter with officers from the Bexar County Sheriff's Department and Texas Department of Public Safety who were attempting to serve a mental health warrant on her son, Fernando Macias.  Plaintiffs are the Estate of Amelia Macias and Ms. Macias's surviving children—Walter Macias, Steven Macias, and Yvonne Schilling.[1]  Plaintiffs originally filed this action in state court against the Texas Department of Public Safety ("DPS"), the Texas Department of Family Protective Services ("DFPS"), and various individual officers involved in the police encounter.  Plaintiffs' Petition was removed to this Court on the basis of federal question jurisdiction.  Following removal, several Defendants filed motions to dismiss alleging lack of subject matter jurisdiction. In response, Plaintiffs filed a First Amended Complaint. More motions to dismiss were filed, and Defendants jointly moved to stay all pretrial proceedings pending the Court's ruling on the various dispositive motions.  The Court granted the motion to stay, ordered Plaintiffs to file an amended pleading addressing various issues regarding the named parties, and ordered Plaintiffs to serve any newly named Defendants within 90 days of the filing of the new amended pleading.

Plaintiffs filed their Second Amended Complaint, the live pleading, and served additional parties, as directed by the Court.  Plaintiff's Second Amended Complaint [#24] names the

---

[1]  Yvonne Schilling's name appears in the case style and in parts of the pleadings as "Shilling."  Her name is also at times referenced as "Schilling" in both the body of Plaintiffs' pleadings and in a Probate Court order attached to Plaintiffs' Second Amended Complaint.  The Court will use the latter spelling throughout this report and recommendation.

following parties as Defendants: the State of Texas (DPS and DFPS); Steven C. McCraw and Kezeli "Kez" Wold (Directors of DPS and DFPS, respectively), in their official and individual capacities; Henry L. Whitman, Jr. (Commissioner of DFPS), in his individual capacity; various DPS officers in their individual capacities (Veronica Gideon, Michael J. Smith, Cody Mitchell, Elias Escalon, Chad Matlock, Nathan Mutz, Brent Barina, Jason Bobo, Joseph Evans, and Drew Pilkington); and two DFPS agents (Crystalynn Nichole Cornevin and Brandi Weimer) in their individual capacities. Plaintiffs requested summonses, and summonses were issued and returned as executed for all named Defendants except for DFPS Director Kez Wold and DPS Officer Joseph Evans.

**A.**     **Allegations in the Live Pleading**

Plaintiffs' Second Amended Complaint alleges the following facts, which the Court accepts as true for purposes of ruling on Defendants' motions to dismiss. Amelia Macias, at the time of her death, was 84 years old and wheelchair-bound. (Second Am. Compl. [#24] at ¶ 1.) Ms. Macias had a 61-year-old son, Fernando Macias, who suffered from mental illness and was responsible for Ms. Macias's care. (*Id.*) Walter Macias, Fernando's older brother, contacted the Bexar County Sheriff's Department for assistance in obtaining a mental health warrant to protect his mother after he became aware that Fernando was mentally unstable and was attempting to buy an AR-15 automatic weapon. (*Id.*) Officers with the Bexar County Sheriff's Department's Mental Health Unit responded to the call at approximately 5:00 p.m. on March 6, 2018, and a standoff ensued between Fernando and the deputies that lasted well into the early morning hours of March 7. (*Id.* at ¶ 2.)

Upon their arrival, the Mental Health Unit officers attempted to enter the residence, but Fernando fired his weapon in an effort to protect himself and his mother, and the officers

4

retreated.  (*Id.* at ¶ 52.)  A Bexar County Special Weapons and Tactics ("SWAT") team was called for assistance while the Mental Health Unit secured the perimeter of the residence.  (*Id.* at ¶ 53.)  Negotiators made multiple attempts to communicate with Fernando but were unsuccessful.  (*Id.* at ¶ 54.)  When the Bexar County SWAT team entered the Macias home to secure the lower story, Fernando opened fire again, striking two officers who were attempting to proceed to the second floor of the home.  (*Id.* at ¶¶ 56–58.)  At this time, Fernando also intentionally shot at propane tanks inside the residence but was unsuccessful in causing a detonation.  (*Id.* at ¶ 59.)  The Bexar County SWAT team then secured the residence and "waited out" Fernando for 15 hours.  (*Id.* at ¶ 60.)  No one saw or heard from Fernando or Ms. Macias during this time period.  (*Id.* at ¶ 65.)  At approximately 3:00 a.m. the following morning, a DPS SWAT team arrived on the scene to relieve and assist members of the Bexar County SWAT team.  (*Id.* at ¶ 61.)

Upon their arrival, the DPS SWAT team introduced various "diversionary devices" into the second floor of the residence, where Fernando had last been observed, in order to increase visibility and provide information about the location of both Fernando and Ms. Macias.  (*Id.* at ¶¶ 63–64.)  In response, Fernando began to fire at the Bexar County deputies from a second-floor window, and gunfire was exchanged between Bexar County SWAT team deputies and Fernando.[2]  (*Id.* at ¶¶ 66–67.)  The DPS SWAT team then sent an unmanned aerial system camera-equipped drone into the residence in another attempt to locate Fernando.  (*Id.* at ¶ 68.)  When the DPS SWAT team believed they had located Fernando on the second floor wearing a

---

[2] The pleadings are ambiguous, but Plaintiffs seem to be alleging that, although the DPS SWAT team arrived to relieve the Bexar County SWAT team, the Bexar County officers had not yet left the property at the time the diversionary devices were released and gunfire was exchanged for the third time during the standoff, or at least that some Bexar County SWAT team members remained involved.

red shirt, the DPS SWAT team then "jointly and deliberately" shot hundreds of bullets into the residence.  (*Id.* at ¶¶ 66, 70.)  Ms. Macias, who was unarmed and lying near the second floor window, was struck multiple times and died of her injuries.  (*Id.* at ¶¶ 69–70.)  Fernando sustained multiple non-fatal gunshot wounds and was taken into custody.  (*Id.* at ¶ 73.)  After the gunfire ceased, it was discovered that Ms. Macias was the one wearing red, not Fernando.  (*Id.* at 66.)

Plaintiffs allege that during the months preceding Ms. Macias's death, Walter and other family members had been attempting to contact DFPS regarding their concerns about Fernando's erratic and delusional behavior and the safety of Ms. Macias, who was in his care and custody. (*Id.* at ¶¶ 6–8.)  Specifically, Fernando had talked to his siblings about an upcoming apocalypse and a government conspiracy and his intent to secure weapons in preparation.  (*Id.* at ¶¶ 8–13.) Walter and other family members tried to advise DFPS that their mother was in danger because Fernando was trying to purchase a weapon, suffered from a mental illness, and was not taking his medication.  (*Id.* at ¶ 14.)  These calls were not returned for months, and instead of responding to the request for help, DFPS agent Defendant Cornevin was advised that the case should be closed by her supervisor.  (*Id.* at ¶¶ 15–16.)

Based on these factual allegations, Plaintiffs assert the following claims:  (1) violations of the Fourth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983 against all Defendant (Count I); (2) the failure to DPS and DFPS to adequately train and supervise their employees in violation of Section 1983 against DPS Director McCraw, DFPS Director Wold, DFPS Commissioner Whitman, and DFPS Supervisor Brandi Weimer (Counts II and III); (3) recovery under Texas's wrongful death and survivorship statutes against all Defendants (Counts IV and V); and (4) tort claims of negligence and gross negligence against DPS and DFPS (Counts VI

and VII).  Plaintiffs seek mental anguish damages and damages for loss of companionship and consortium, as well as punitive damages.   Finally, Plaintiffs seek a permanent injunction against Defendants to prevent future violations of the kind suffered by Ms. Macias.

## B.    Pending Motions

All Defendants who have been served (i.e., all Defendants except for DFPS Director Kez Wold and DPS Officer Joseph Evans) have moved for dismissal of Plaintiffs' Second Amended Complaint.[3]  The motions address a variety of alleged legal defects in Plaintiffs' pleadings, argue for dismissal for lack of subject matter jurisdiction and for failure to state a claim, and invoke various immunities.

Three of the motions were filed prior to Plaintiffs' filing of their Second Amended Complaint [#9, #11, #12].  The Court has determined that although Plaintiffs' amended pleading was filed after the motions, it does not moot the motions.  Although a motion to dismiss may be rendered moot by a supplemental or amended pleading, no party suggests that is the appropriate course here.   Plaintiffs' Second Amended Complaint makes only minor amendments to the factual allegations in the First Amended Complaint and does not add any additional claims.  Accordingly, the undersigned will consider the arguments made in the earlier filed motions to dismiss as they apply to the Second Amended Complaint rather than dismissing as moot these motions and requiring the filing of amended motions.  *See* Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1476 (3d ed. 2002) ("[D]efendants should not be required to file a new motion to dismiss simply because an amended pleading was introduced while their motion was pending.  If some of the defects raised in the original motion

---

[3]  All references to "Defendants" herein refer to all named Defendants except for Wold and Evans.

remain in the new pleading, the court may simply consider the motion as being addressed to the amended pleading. . . . To hold otherwise would be to exalt form over substance.").

## II.  Legal Standards

The majority of the arguments raised in Defendants' motions to dismiss seek dismissal for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted.  The undersigned will briefly address these legal standards.  Any additional standards will be addressed as they apply to the analysis of each specific legal issue raised by the parties.

**A.      Dismissal for Lack of Subject Matter Jurisdiction**

Motions filed under Rule 12(b)(1) of the Federal Rules of Civil Procedure allow a party to challenge the subject-matter jurisdiction of the district court to hear a case.  *See* Fed. R. Civ. P. 12(b)(1); *Ramming v. United States*, 281 F.3d 158, 161.  When a court's subject matter jurisdiction is factually attacked, the court may consider matters outside of the pleadings. *Oaxaca v. Roscoe*, 641 F.2d 386, 391 (5th Cir. 1981).  Where a motion to dismiss for lack of jurisdiction is limited to a facial attack on the pleadings, it is subject to the same standard as a motion brought under Rule 12(b)(6).  *See Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008); *Benton v. United States*, 960 F.2d 19, 21 (5th Cir. 1992).  The burden of establishing federal jurisdiction rests on the party seeking the federal forum.  *Ramming*, 668 F.3d at 161.

**B.      Dismissal for Failure to State a Claim**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "Although a

complaint "does not need detailed factual allegations," the "allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations pleaded must show "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.

Generally, in deciding a motion to dismiss, a court may not look beyond the four corners of the Plaintiff's pleadings without converting the motion to a motion for summary judgment. *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 261 (5th Cir. 1999); Fed. R. Civ. P. 12(d). The Court may, however, consider documents attached to the complaint and those that are central to the claims at issue and incorporated into the complaint by reference. *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court "accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Martin K. Eby Const. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004) (internal quotation omitted). However, a Court need not credit conclusory allegations or allegations that merely restate the legal elements of a claim. *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 469 (5th Cir. 2016) (citing *Iqbal*, 556 U.S. at 678). In short, a claim should not be dismissed unless the court determines that it is beyond doubt that the plaintiff cannot prove a plausible set of facts that support the claim and would justify relief. *See Twombly*, 550 U.S. at 570.

### III.  Analysis

Defendants seek dismissal of Plaintiffs' Second Amended Complaint based on the following theories:  (1) Plaintiffs lack the legal capacity to sue Defendants; (2) Plaintiffs have failed to establish standing to sue DFPS and the individually named DFPS employees because

they cannot establish that Ms. Macias's or their own injuries are fairly traceable to the actions of these Defendants; (3) DPS and DFPS cannot be sued under Section 1983 because they are not "persons" for purposes of the statute; (4) the individually named DPS officers and DFPS employees enjoy qualified immunity from liability as to Plaintiffs' constitutional claims raised pursuant to Section 1983; (5) DPS, DFPS, and the individually named DPS officers and DFPS employees enjoy either sovereign immunity or cannot be sued under the election-of-remedies doctrine as to Plaintiffs' tort claims; and (6) Plaintiffs failed to properly serve DFPS employee Crystalynn Nichole Cornevin.

After considering all of the arguments of the parties, the pleadings, and the governing law, the undersigned concludes that Plaintiffs have standing to sue the DFPS Defendants but not to seek a permanent injunction against Defendants. The undersigned further concludes that all of Plaintiffs' federal constitutional claims asserted pursuant to Section 1983 must be dismissed either due to pleading deficiencies or the entitlement of certain Defendants to qualified immunity. In light of this conclusion, the undersigned will recommend that the District Court decline to exercise supplemental jurisdiction over Plaintiffs' remaining state-law claims and remand this case to state court. The Court therefore need not, and the undersigned will not, decide the question of Plaintiffs' legal capacity to sue Defendants, the viability of Plaintiffs' tort claims, or the service issues raised by Defendant Cornevin. These issues can be addressed by the state court after remand.

## A.    Legal Capacity of Plaintiffs

All Defendants argue that Plaintiffs lack the legal capacity to sue Defendants. This argument was first raised by DPS and several individual officers in a motion to dismiss filed before Plaintiffs filed their Second Amended Complaint [#9]. That motion advances two

arguments: (1) Plaintiffs' First Amended Complaint failed to establish that Yvonne Schilling, Ms. Macias's daughter, is the personal representative of Ms. Macias's estate with capacity to bring suit on the estate's behalf; and (2) Plaintiffs cannot sue Defendants as heirs to Ms. Macias's estate on behalf of themselves because they failed to join an indispensable party—their brother Fernando Macias, a fourth heir.

Plaintiffs' Second Amended Complaint responds to these arguments by amending the pleadings to reflect that Fernando Macias died after the incident giving rise to this suit and is therefore not a surviving heir of the estate. (Second Am. Compl. [#24] at ¶ 3.) Plaintiffs attach a Custodial Death Report to their pleadings, stating that Fernando Macias died from end-stage renal disease on December 16, 2018 in a local hospital facility while in police custody. (Death Report [#24-2].) Plaintiffs' amended pleading also clarifies that Schilling is proceeding as the representative of the estate of Ms. Macias. (Second Am. Compl. [#24] at ¶ 31.) Attached to Plaintiffs' pleadings is an Order Granting Letters of Administration from the Probate Court of Bexar County, appointing Schilling as Administrator of the Estate of Amelia H. Macias on December 6, 2019. (Probate Order [#24-1].) Each of the three surviving heirs to Ms. Macias's estate are also proceeding as individuals on behalf of themselves in this case. (Second Am. Compl. [#24] at 1.)

All four motions to dismiss that were filed after these amendments continue to challenge the capacity of Plaintiffs to bring this lawsuit. It is unclear, however, which arguments raised in the original motion are still being advanced by Defendants—Schilling's capacity to proceed as personal representative of her mother's estate or Plaintiffs' capacity to proceed as heirs, despite the death of Fernando.

Rule 17 of the Federal Rules of Civil Procedure governs the capacity to sue and be sued. An action must be prosecuted in the name of the real party in interest under federal law. Fed. R. Civ. P. 17(a)(1). Plaintiffs' Second Amended Complaint asserts tort claims arising under Texas law and constitutional violations pursuant to Section 1983. (Second Am. Comp. [#24] at 11–18.) Plaintiffs also invoke Texas's Wrongful Death and Survival Statutes. (*Id.* at 15–16.) By this lawsuit, Plaintiffs seek damages for their own pain and suffering related to the loss of their mother's life and for the violation of Ms. Macias's constitutional rights in the moments leading up to her death and for the recovery of her own mental anguish damages. (*Id.* at 19.)

The Fifth Circuit has held that state wrongful death and survival statutes, if available, are incorporated into federal law to provide a means for recovery through a Section 1983 civil rights action for both classes of victims—decedents and their survivors. *Rhyne v. Henderson County*, 973 F.2d 386, 390 (5th Cir. 1992) (citing 42 U.S.C. § 1988) (providing that state's common law, as modified and changed by state's constitution and statutes, is used to fill any gaps in administration of federal civil rights actions). *See also Brazier v. Cherry*, 293 F.2d 401, 409 (5th Cir. 1961) (reasoning that unless decedent's cause of action survived his death, remedies provided by Section 1983 would fail when injury is death and incorporating Georgia's survivorship and wrongful death statutes to make Section 1983 "fully effectual"). Accordingly, Texas law governs the question of who has capacity to assert the state and federal claims in this action based on the alleged wrongful death of Ms. Macias. *See Rhyne*, 973 F.2d at 390–91 (finding that standing under Texas wrongful death and survival statutes is incorporated into federal civil rights statutes).

In light of the undersigned's conclusion that Plaintiffs' federal claims under Section 1983 should be dismissed and the remaining claims remanded to state court, the Court should leave the

question of Plaintiffs' capacity to sue Defendants under Texas law for determination by the state court following remand.  The Court need not determine prior to remand whether Schilling has properly been appointed as the personal representative or executor of her mother's estate, whether she ultimately has capacity to bring these claims, and whether there is some basis for Schilling and her brothers to proceed in an individual capacity as Plaintiffs on their state-law claims against Defendants.  This determination will require a consideration of extrinsic evidence, as well as briefing on the requirements of the Texas Estates Code and is best left to the Texas court.  Plaintiffs' Section 1983 claims fail for other reasons set forth in detail in this report and recommendation, and therefore should be dismissed, regardless of any issue surrounding Plaintiffs' capacity to bring this suit.

**B.      Standing of Plaintiffs to Sue DFPS Defendants**

DFPS, as well as individually named DFPS employees Whitman, Weimer, and Cornevin, (hereinafter "the DFPS Defendants") argue that Plaintiffs have failed to establish standing to pursue their claims against them because they cannot establish that Ms. Macias's or their own injuries are fairly traceable to the conduct of this class of Defendants.

Standing is jurisdictional.  *LeTourneau Lifelike Orthotics & Prosthetics, Inc. v. Wal-Mart Stores, Inc.*, 298 F.3d 348, 351 (5th Cir. 2002).  A plaintiff bears the burden of establishing the three elements of standing: (1) an injury in fact; (2) that is fairly traceable to the challenged actions of the defendant (causation); and (3) that the injury is likely to be redressed by a favorable decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561–62 (1992).  The DFPS Defendants challenge Plaintiffs' ability to establish causation, as well as the potential for the identified injuries to be redressed by the requested permanent injunction.

i.   <u>Causation</u>

Regarding causation, the DFPS Defendants argue that Plaintiffs do not allege facts from which a reasonable inference could be drawn that Ms. Macias's injuries and death were traceable to their actions.  Plaintiffs' theory of liability as to the DFPS Defendants is that their failure to respond to Plaintiffs' pleas for help regarding Fernando's erratic and delusional behavior and their mother's safety was in part the cause of the standoff that ensued in March 2018 and Ms. Macias's death.  The DFPS Defendants argue that Plaintiffs' allegations to this effect are purely speculative, conclusory, and insufficient to satisfy their burden regarding causation and standing because there are no allegations that directly tie any DFPS employee to the March 6–7, 2018 standoff.  The undersigned disagrees.

Plaintiffs' Second Amended Complaint alleges that Ms. Macias had been under the care of DFPS for over a year before her death and had come to rely on regular routine visits from DFPS case workers overseeing the care of Ms. Macias by her son, Fernando.  (Second Am. Compl. [#24] at ¶ 5.)  Plaintiffs further allege that Walter Macias and other family members made numerous calls between January 2017 and March 2018 to DFPS regarding concerns about the safety of his mother in the care of Fernando.  (*Id.* at ¶¶ 4, 6.)  During these calls, Plaintiffs allegedly reported to DFPS employees that Fernando was not compliant with his medication; that he was experiencing delusions regarding space aliens staging an earth invasion, the apocalypse, and a government conspiracy; and that he was trying to secure guns to protect himself.  (*Id.* at ¶¶ 8, 9, 14.)  Plaintiffs allege that these calls were not returned for months and that instead of responding to the pleas for help, Defendant Cornevin was advised by her supervisor to close Ms. Macias's case, and the DFPS visits to Ms. Macias abruptly stopped.  (*Id.* at ¶¶ 5, 15–16.)

Accordingly, Plaintiffs contend that DFPS as an agency was aware that Fernando was mentally unstable yet responsible for the care of Ms. Macias.  (*Id.* at ¶ 22.)

Based on these allegations, Plaintiffs have pleaded causes of action against the DFPS Defendants for failure to train and supervise their employees in keeping regular contact with their clients to ensure their safety and in investigating calls reporting abuse, neglect, and other safety concerns.  (*Id.* at ¶¶ 84, 92–93.)  Plaintiffs allege that DFPS failed to protect Ms. Macias from imminent injury or harm, by removing her from the home or taking other action, despite notice that she was in danger.  (*Id.* at ¶¶ 86–89.)  According to Plaintiffs' pleadings, but for the failures of DFPS, Ms. Macias would not have been held in a hostage situation and would not have died.  (*Id.* at ¶ 89.)

These allegations are neither conclusory nor speculative and are sufficient to allege that Ms. Macias's death and the legal injuries asserted in this action are fairly traceable to the actions of the DFPS Defendants.  For an injury to be fairly traceable to the actions of a defendant, the injury may not be the result of "the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560.  As the Supreme Court has explained, however, it is incorrect to equate this principle with the requirement that the defendant's actions be the "very last step in the chain of causation."   *Bennett v. Spear*, 520 U.S 154, 168–69 (1997).   Article III's traceability requirement "need not be as close as the proximate causation needed to succeed on the merits of a tort claim."  *Toll Bros., Inc. v. Township of Readington*, 555 F.3d 131, 142 (3d Cir. 2009); *see also Bennett*, 520 U.S. at 168 (proximate cause of harm is not equivalent with fairly traceable requirement for standing purposes); *Env't Texas Citizen Lobby, Inc. v. ExxonMobil Corp.*, 968 F.3d 357, 369 n.4 (5th Cir. 2020) ("'fairly traceable' requirement does not require tort-like causation with its proximate cause requirement").  An indirect causal relationship will suffice, so

long as "there is a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant." *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000) (internal quotations and citations omitted).

Although some conduct can be "too attenuated" from the alleged injury to give rise to causation, *see Hanson v. Veterans Admin.*, 800 F.2d 1381, 1385 (5th Cir. 1986), a defendant's conduct—though remote in time from the injury itself can still be traceable to that injury. *See, e.g.*, *Tran v. Pflugerville Indep. Sch. Dist.*, No. A-13-CA-145 DAE, 2014 WL 12160774, at *3 (W.D. Tex. May 23, 2014), *report and recommendation adopted sub nom. Tran v. Plugerville Indep. Sch. Dist.*, No. A-13-CV-145-DAE, 2014 WL 12160775 (W.D. Tex. June 17, 2014) (allegations that school district's failure to provide requested accommodations ultimately exacerbated plaintiff's bipolar conditions and caused mental breakdown and threats to supervisors were sufficient to satisfy causation element of standing requirement). In summary, Plaintiffs have adequately alleged the traceability of the injuries asserted in this lawsuit to the conduct of the DFPS Defendants. Plaintiffs therefore have standing to assert their various federal and state law claims against them.

    ii.   <u>Redressability of Permanent Injunction</u>

The DFPS Defendants further argue that Plaintiffs lack standing to seek a permanent injunction against DFPS. The DFPS Defendants contend that the requested permanent injunction will not redress the injury to Ms. Macias or her estate because it is not likely that Plaintiffs will be subject to DFPS's jurisdiction in the future or subject to any policy that, if changed as a result of the injunction, would prevent future injury. Plaintiff's responses to the DFPS Defendants' motions to dismiss do not address this argument.

Plaintiffs have failed to establish their standing to pursue injunctive relief against the DFPS Defendants.  Plaintiffs bear the burden to establish standing for each type of relief sought. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).  In terms of redressability, Plaintiffs must show that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.  *Lujan*, 504 U.S. at 561.  "To obtain standing for injunctive relief, a plaintiff must show that there is reason to believe that he would directly benefit from the equitable relief sought."  *Plumley v. Landmark Chevrolet, Inc.*, 122 F.3d 308, 312 (5th Cir. 1997).  Where the injured party has died, as here, there is no "real or immediate threat that [she] will be wronged again."  *Id.*  Because Ms. Macias, the individual allegedly subject to the jurisdiction of DFPS, has died, and Plaintiffs do not allege any facts that suggest they or a family member might be a client of DFPS in the future, they have failed to demonstrate their standing to seek the requested injunctive relief against the DFPS Defendants.

**C.     Section 1983 Claims**

Plaintiffs assert several causes of action under 42 U.S.C. § 1983, alleging a violation of rights secured by the Fourth and Fourteenth Amendments of the Constitution.  (Second Am. Compl. [#24] at ¶¶ 75–93.)  These claims allege that Defendants, in their individual capacities, used excessive force in violation of the Fourth Amendment and deprived Ms. Macias of her right to life in violation of the due process protections of the Fourteenth Amendment.  (*Id.* at ¶¶ 75–81.)  Plaintiffs also allege that the failure of DPS Director McCraw, DFPS Director Wold, DFPS Commissioner Whitman, and DFPS supervisor Weimer to train and supervise their employees resulted in these constitutional violations.  (*Id.* at ¶¶ 82–93.)

All Defendants seek dismissal of Plaintiffs' Section 1983 claims, arguing that (1) DPS and DFPS and all officers and employees named in their official capacities are not persons liable

to suit under Section 1983; and (2) those DPS and DFPS Defendants named in their individual capacity are protected by qualified immunity.

        i.        <u>DPS and DFPS are not "persons" subject to suit under Section 1983.</u>

Section 1983 prohibits "persons" acting under the color of law from depriving another of any "rights, privileges, and immunities secured by the Constitution and laws." 42 U.S.C. § 1983. To state a claim under 42 U.S.C. § 1983, Plaintiffs must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law. *Doe ex rel. Magee v. Covington County Sch. Dist. ex rel. Keys*, 675 F.3d 849, 854 (5th Cir. 2012). Defendants argue that Plaintiffs' Section 1983 claims against DPS, DFPS, and any Defendants named in their official capacities must be dismissed because these Defendants are not "persons" for purposes of Section 1983.

It is well-established that States are not persons within the meaning of Section 1983, and Section 1983 "does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65–66 (1989). By extension, neither are state agencies. *Hyatt v. Sewell*, 197 Fed. App'x 370 (5th Cir. 2006) (per curiam). Furthermore, official-capacity suits are merely another way of pleading an action against an entity of which a public officer is an agent and are therefore treated as suits against the State. *Hafer v. Melo*, 502 U.S. 21, 25 (1991). Accordingly, insofar as Plaintiffs are attempting to sue DPS or DFPS, which are state agencies, or any Defendant in an official capacity under Section 1983, these claims must be dismissed.

ii.     The DPS Officers are entitled to qualified immunity as to Plaintiffs' Fourth
        Amendment claim.

Plaintiffs' Second Amended Complaint makes clear that all individually named Defendants, whether employees of DPS or DFPS, are sued in their individual capacities under Section 1983.  (Second Am. Compl. [#24] at 1–2, ¶ 76.)  The nine individual DPS Officers who have been served with process (Gideon, Smith, Mitchell, Escalon, Matlock, Mutz, Barina, Bobo, and Pilkington) (hereinafter "the DPS Officers") invoke the defense of qualified immunity as to these claims.  The DPS Officers are entitled to qualified immunity as to Plaintiffs' Fourth Amendment claims.

**Qualified Immunity Standard.**  Qualified immunity shields federal and state officials from individual liability for civil damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct.  *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Lower courts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

In the context of a qualified immunity analysis, the facts are construed in the light most favorable to the party asserting the injury.  *Austin v. Johnson*, 328 F.3d 204, 207 (5th Cir. 2003) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  A right is clearly established for purposes of the second step of the qualified-immunity analysis if it would be clear to a reasonable official, at the time of the challenged conduct, that his or her conduct violated the statutory or constitutional right at issue.  *Saucier*, 533 U.S. at 206.  Stated another way, a right is clearly established if "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

The Supreme Court has repeatedly admonished lower courts not to define clearly established law at a high level of generality.  *See, e.g.*, *al-Kidd*, 563 U.S. at 742.  Rather, the inquiry must be undertaken in light of the specific factual context of the case.  *Mullenix v. Luna*, 577 U.S. 7, 12 (2015).  The dispositive question is "whether the violative nature of particular conduct is clearly established." *al-Kidd*, 563 U.S. at 742.  However, there need not be a specific precedent on point that presents identical or even factually analogous circumstances for a defendant to be on notice that their conduct violates the Constitution.  *Taylor v. Riojas*, --U.S.--, 141 S. Ct. 52, 53–54 (2020) (per curiam) (citing *Hope v. Peltzer*, 536 U.S. 730, 741 (2002) ("a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question")).

At the motion-to-dismiss stage, as here, the Fifth Circuit merely requires plaintiffs invoking Section 1983 to plead "specific facts that, if proved, would overcome the individual defendant's immunity defense." *Jackson v. City of Beaumont Police Dep't*, 958 F.2d 616, 620 (5th Cir. 1992) (internal quotation and citation omitted).  Accordingly, to rebut the qualified immunity of the individual-capacity DPS and DFPS Defendants, Plaintiffs' Second Amended Complaint must contain allegations that, when viewed in the light most favorable to Plaintiffs, if ultimately proved, would plausibly show that Defendants' conduct violated a clearly established constitutional right of Ms. Macias.  *Saucier*, 533 U.S. at 206.

**Ms. Macias was seized for purposes of the Fourth Amendment.**  The Fourth Amendment protects against unreasonable searches and seizures.  U.S. Const. Amend. IV.  Plaintiffs allege that the killing of Ms. Macias by members of the DPS SWAT team constituted excessive force and an unreasonable seizure in violation of the Fourth Amendment.  (Second Am. Compl. [#24] at ¶¶ 75–81.)

The DPS Officers advance several arguments in support of their qualified immunity defense, one of which goes to the central question of whether the operative facts in this case can even give rise to a Fourth Amendment claim.   The DPS Officers argue that Ms. Macias, the unintended victim of an accidental shooting, was not "seized" within the meaning of the Fourth Amendment and, therefore, her death cannot give rise to a constitutional violation based on allegations of excessive force or unreasonable seizure.

It is true that "a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement, . . . but only when there is a governmental termination of freedom of movement *through means intentionally applied*."  *Brower v. County of Inyo*, 489 U.S. 593, 596–97 (1989) (emphasis in original).   And the "[v]iolation of the Fourth Amendment requires . . . [that the] detention or taking itself must be willful."  *Id.* at 596.   These principles ensure that every "negligent taking of a life" does not become "a constitutional deprivation" and have been applied consistently to foreclose Fourth Amendment claims in the context of the accidental deaths of innocent bystanders.  *Young v. City of Killeen*, 775 F.2d 1349, 1353 (5th Cir. 1985).  *See also Moore v. Indehar*, 514 F.3d 756, 760 (8th Cir. 2008) (collecting cases) ("bystanders are not seized for Fourth Amendment purposes when struck by an errant bullet in a shootout"); *Childress v. City of Arapaho*, 210 F.3d 1154, 1156–57 (10th Cir. 2000) (finding, in hostage shooting case, no Fourth Amendment "seizure" because "[t]he officers intended to restrain the minivan and the fugitives, not [the hostages]"); *Claybrook v. Birchwell*, 199 F.3d 350, 355, 359 (6th Cir. 2000) (determining that plaintiff struck by errant bullet during police shootout was not seized because officers were aiming at her father-in-law and did not realize she was hiding in nearby parked car); *Medeiros v. O'Connell*, 150 F.3d 164, 167–69 (2nd Cir. 1998) (holding that where a hostage is struck by an errant bullet, there is

no Fourth Amendment seizure or violation); *Rucker v. Harford County, Md.*, 946 F.2d 278, 281 (4th Cir. 1991) (explaining that *Brower* "does not mean . . . that a seizure occurs just so long as the act of restraint itself is intended . . . though it restrains one not intended to be restrained"); *Landol–Rivera v. Cruz Cosme*, 906 F.2d 791, 794–96 (1st Cir. 1990) (declining to hold that hostage was seized for Fourth Amendment purposes when police officers fired at suspect's getaway car and accidentally struck the hostage).

In the Fifth Circuit, a panel recently addressed the issue of accidental deaths in a case involving a firearms training exercise hosted by the Mississippi Gaming Commission, wherein a firearms instructor forgot to replace his real firearm with a "dummy" firearm used for training and unintentionally shot a colleague in the chest with live ammunition. *Gorman v. Sharp*, 892 F.3d 172, 174 (5th Cir. 2018). The victim's wife sued the officer under Section 1983, alleging a Fourth Amendment violation. *Id.* The trial court denied the officer's defense of qualified immunity, and the Fifth Circuit reversed, concluding that there could be no Fourth Amendment violation because there was no seizure, as the instructor had not intended to shoot his colleague. *Id.* at 175. The Fifth Circuit reasoned that the shooting was not willfully performed by the instructor, whose "only intention in pulling the trigger . . . was to educate his audience as a firearms training instructor" and there could be no seizure "in the absence of intentional conduct." *Id.*

A district court from the Southern District of Texas last year applied *Gorman* in the context of the accidental death during a "shootout" arising from a domestic disturbance. *Garcia v. City of McAllen, Tex.*, No. 7:19-cv-00068, 2020 WL 1660095, at * 1 (S.D. Tex. Apr. 1, 2020). In that case, police officers from the McAllen Police Department responded to a domestic violence call at a home involving several minors and their stepfather, which devolved into a

shootout after the stepfather shot several rounds at his wife and the minors during a police interview. *Id.* The police officers accidentally struck one of the minors during the encounter, who survived but suffered injuries. *Id.* The district court held that because the plaintiffs alleged that the officer discharging the shot that injured the minor did not intend to shoot the victim but rather was targeting the stepfather, their excessive force claim was not cognizable under the Fourth Amendment and the defendants were entitled to judgment on the pleadings. *Id.* at *4.

The DPS Officers analogize the alleged facts in this case to *Gorman* and *Garcia*, arguing that the pleadings allege that Fernando was the intended target, not Ms. Macias, and therefore Plaintiffs' Fourth Amendment claim is similarly foreclosed. This argument misrepresents the pleadings. Plaintiffs' Second Amended Complaint alleges that the DPS Officers "improperly concluded that Fernando was wearing a red shirt and targeted the red shirt," when Ms. Macias was in fact "the only one wearing red in the home." (Second Am. Compl. [#24] at ¶¶ 26, 66.) Viewing these facts in the light most favorable to Plaintiffs, Plaintiffs' allegations allege that the DPS Officers intended to terminate the freedom of movement of the person dressed in red (i.e., Ms. Macias) and in fact targeted Ms. Macias in the shooting, under the mistaken impression that she was Fernando.

The Supreme Court has held that if the police purposely detain a person under the mistaken impression that he is someone else, they have seized him under the Fourth Amendment. *Brower*, 489 U.S. at 596 ("A seizure occurs even when an unintended person or thing is the object of the detention or taking."); *Hill v. California*, 401 U.S. 797, 802–05 (1971) (analyzing reasonableness of arrest of innocent man in suspect's apartment under the Fourth Amendment where arrestee was intentionally seized but as a result of mistaken identity). *See also Blackwell v. Barton*, 34 F.3d 298, 302 (5th Cir. 1994) (analyzing claim for illegal arrest based on mistaken

identity under the Fourth Amendment).  These principles have been applied repeatedly in the context of shootings and other uses of force on innocent victims, where the victim is the intended object of the force, as opposed to an unseen bystander merely caught in crossfire or killed accidentally during a high-speed chase.  *See, e.g.*, *Vathekan v. Prince George's Cty.*, 154 F.3d 173, 178 (4th Cir. 1998) (innocent person, believed to be a burglar, had been seized for purposes of the Fourth Amendment where officer released his dog to bite her, because the seizure itself was nonetheless "purposeful"); *Landol–Rivera*, 906 F.2d at 796 ("[W]hen officers mistakenly shoot an innocent victim thinking that he is the suspect they are pursuing, the seizure was intended even though the target was not.").

The same result is compelled here.  Plaintiffs' pleadings allege that through the use of diversionary devices and drones the DPS SWAT team mistook Ms. Macias for Fernando and targeted her during a shootout intending to result in the seizure of Fernando.  Plaintiffs have alleged a Fourth Amendment seizure.

**Plaintiffs have pleaded a plausible Fourth Amendment violation.**  To establish a claim of excessive force under the Fourth Amendment, Plaintiffs must establish (1) an injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.  *Ratliff v. Aransas County, Tex.*, 948 F.3d 281, 287 (5th Cir. 2020).  The "touchstone of Fourth Amendment analysis is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991).  The reasonableness inquiry in excessive force cases is an objective one—the question is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Graham v. Connor*, 490 U.S. 386, 397 (1989) (internal quotation and citation omitted).  The reasonableness of the force used "must be judged from the

perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396.  This test recognizes that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving about the amount of force that is necessary in a particular situation."  *Id.*

Deadly force, the degree of force employed here, is only permitted to protect the life of the shooting officer or others.  *Cole v. Carson*, 935 F.3d 444, 453 (5th Cir. 2019) (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).  "Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Garner*, 471 U.S. at 11.  In evaluating whether the use of force was reasonable, courts look to the "totality of the circumstances," giving "careful consideration to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Ramirez v. Martinez*, 716 F.3d 369, 377 (5th Cir. 2013) (citing *Graham*, 490 U.S. at 396).

"The timing, amount, and form of a suspect's resistance are key to determining whether the force used by an officer was appropriate or excessive."  *Joseph v. Bartlett*, 981 F.3d 319, 332 (5th Cir. 2020).  "While a suspect's refusal to comply with instructions may indicate that physical force is justified, officers must also select the appropriate *degree* of force." *Id.* (internal citations omitted) (emphasis in original).  To stay within constitutional bounds, an officer must use force with "measured and ascending" actions that correspond to a suspect's "escalating verbal and physical resistance."  *Poole v. City of Shreveport*, 691 F.3d 624, 629 (5th Cir. 2012) (internal quotation and citation omitted).  "Therefore, force may be less justified or unjustified

when a suspect engages in passive resistance, as opposed to active resistance." *Joseph*, 981 F.3d at 332–33 (internal quotations and citations omitted).

The DPS Officers argue their use of deadly force was objectively reasonable because at the time they made their assault on the Macias residence they were defending against an active shooter who posed a threat of serious harm to the officers and his hostage.  The DPS Officers focus on Plaintiffs' allegations that Fernando had repeatedly opened fire on three different teams of law enforcement throughout the overnight standoff at his residence, had struck two officers, and had refused thus far to cooperate with anyone in the execution of the mental health warrant.

Plaintiffs, on the other hand, argue that the DPS SWAT team unreasonably chose to escalate the standoff with Fernando rather than continuing attempts to negotiate and chose to assault the Macias residence with hundreds of bullets at a moment when there was a "lull in action," when Fernando was not employing any weapons and was not actively resisting the SWAT team.  Plaintiffs describe Fernando, at the time of the shooting that killed Ms. Macias, as "non-threatening" and argue that it was unreasonable to use deadly force at a time when he was merely "passively resisting" the officers.

Construing the pleadings in the light most favorable to Plaintiffs, Plaintiffs have stated a plausible Fourth Amendment violation—that Defendants used excessive force that was objectively unreasonable under the totality of the circumstances.  Plaintiffs could prove a set of facts consistent that their allegations that would demonstrate that the DPS Officers, though perhaps entitled to use some force, did not use the appropriate *degree* of force, and the deadly force employed was neither measured nor corresponded with the level of Fernando's resistance. *See Joseph*, 981 F.3d at 332;  *Poole*, 691 F.3d at 629.

Regarding the severity of the crime at issue, at least in terms of the initial impetus for a visit from the police, Plaintiffs' pleadings establish that the police encounter with Fernando began in an attempt to secure mental health treatment for Fernando by serving a mental health warrant, not in response to a crime.  Accepting Plaintiffs' allegations as true, Fernando also did not present an immediate threat to the safety of the DPS Officers, Ms. Macias, or the general public at the moment they chose to employ deadly force and tactically assault the Macias residence.  True, Fernando had fired his weapon at the various teams of officers dispatched to his home on three different occasions, but he had only done so when faced with an officer attempting to enter his residence in person or through the use of diversionary devices or drones. When the officers remained secured outside his home, as they allegedly did for the 15 hours prior to the arrival of the DPS Officers, all was quiet and no one heard from or saw Fernando or Ms. Macias.  Importantly, the allegations state that at the precise moment that the DPS Officers allegedly fired hundreds of weapons into the Macias residence, there was a lull in the action, albeit a brief one, as Plaintiffs allege that Fernando and the Bexar County SWAT team exchanged fire after the DPS Officers had arrived and had released diversionary devices at the residence.  Nonetheless, Plaintiffs allege that Fernando was not actively shooting or threatening to shoot anyone at the time DPS Officers assaulted the Macias residence with the gunfire that led to Ms. Macias's death.

Courts have placed weight "on the quickness with which law enforcement personnel have escalated from negotiation to force." *Brothers v. Zoss*, 837 F.3d 513, 520 (5th Cir. 2016).  Here, there are no allegations that DPS Officers engaged in any attempts to negotiate with Fernando at any point throughout the standoff or that any negotiations by anyone else present at the scene occurred during the 15 hours prior to their arrival.  Rather, the pleadings state that the DPS

Officers arrived, immediately moved to identify Fernando's location, then quickly and collectively employed deadly force.  At the time the officers employed force, Fernando was not attempting to flee; the scene was secure; the suspect was contained in his home; and there are no allegations that Fernando was warned that the DPS Officers were about to employ deadly force in an attempt to seize him.  Importantly, the DPS Officers also knew that Ms. Macias, a wheelchair-bound elderly woman, was inside the residence and therefore very likely to suffer injury or death as a result of their decision to shoot indiscriminately at the second story of the residence.

Resolving all inferences in Plaintiffs' favor, Plaintiffs have stated a plausible claim that the degree of force employed by the DPS Officers was not commensurate to the need and was objectively unreasonable.

**The DPS Officers are nonetheless entitled to qualified immunity.**  That Plaintiffs have stated a plausible Fourth Amendment violation is not the end of the Court's inquiry.  The DPS Officers have invoked qualified immunity, and the Court must therefore determine whether, at the time of the alleged wrongful conduct at issue, the alleged violation of the Fourth Amendment was clearly established.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Lytle v. Bexar County, Tex.*, 560 F.3d 404, 410 (5th Cir. 2009) (quoting *Saucier*, 533 U.S. at 202).  If officers of reasonable competence could differ on the lawfulness of defendant's actions, the defendant is entitled to qualified immunity.  *See Luna*, 577 U.S. at 11. As previously noted, although there need not be a case directly on point addressing similar factual circumstances, the unlawfulness of the challenged conduct must still be "beyond debate."

*Joseph*, 981 F.3d at 330.  Again, at the motion to dismiss stage, as here, Plaintiffs must plead specific facts that, if proved, would overcome the individual defendant's immunity defense, because, at the time of the conduct at issue, the DPS Officers had fair notice that their conduct was unlawful.  *See Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).  Plaintiffs' allegations do not set forth a clearly established Fourth Amendment violation.

In attempting to rebut the DPS Officers' qualified immunity defense, Plaintiffs direct the Court to only one case, *Bolton v. City of Austin*, Case No. A-17-CA-077-SS, 2018 WL 2392557, at * 1 (W.D. Tex. May 25, 2018).  *Bolton* did not involve a hostage standoff or SWAT teams or even the use of deadly force.  It instead involved the use of non-deadly force on a patron outside of a bar on Sixth Street in Austin, Texas.  The plaintiff's version of the facts asserted that officers approached him based on allegations made by a bar employee; that little conversation was conducted; and that he exhibited at most passive resistance before the officers resorted to overwhelming physical force.  *Bolton*, 2018 WL 2392557, at *5.  The court held that "[a] reasonable officer would have known abruptly resorting to overwhelming physical force rather than continuing verbal negotiations was unlawful in such a situation" and denied qualified immunity.  *Id.*

Plaintiffs presumably cite this case in an attempt to illustrate the broad principle that the use of escalating force is clearly unconstitutional where a suspect is engaged in at most passive resistance to an arrest.  This principle, as applied to a variety of settings, was indeed clearly established at the time of the incidents underlying this suit.  For example, the Fifth Circuit held in 2017 that officers could not invoke qualified immunity as a defense to the use of force on a suspect that was stopped for only a minor traffic offense and who at most had passively resisted the officers.  *Hanks v. Rogers*, 853 F.3d 738, 748–49 (5th Cir. 2017).  To escalate the situation

by using force when the suspect's verbal and passive physical resistance "was on the decline" was clearly unreasonable. *Id.*  Similarly, in 2020, the Court held that it was clearly established in 2017 that it was unconstitutional for officers to employ tasers and batons, punching and kicking a suspect who had committed no crime, was unarmed, posed no threat to himself or others, and was subdued in a fetal and defensive position.  *See Joseph*, 981 F.3d at 333–43.  These cases establish, as *Bolton* held, that at "an officer violates the Fourth Amendment if he resorts to overwhelming physical force rather than continuing verbal negotiations with an individual who poses no immediate threat or flight risk, who engages in, at most, passive resistance" and whom the officer stopped for a minor traffic violation or for no crime at all.  *See Hanks*, 853 F.3d at 747.

The facts as alleged by Plaintiffs, however, present something distinct and different from what is illustrated in these cases.  Plaintiffs attempt to analogize Fernando's actions with those of the plaintiffs in *Bolton*, *Hanks*, or *Joseph*—plaintiffs who were passively resisting officers or not resisting at all.  Yet, Fernando was armed and had engaged in three different shooting incidents with the officers dispatched to his residence throughout an overnight standoff, had in fact struck two different officers with bullets during those incidents, and had demonstrated his willingness to disregard his own life and those of others, including his hostage, in attempting to detonate propane tanks inside the house.  Even accepting all of Plaintiffs' allegations as true, and assuming Fernando was not engaged in any active resistance at the moment of the DPS Officers' assault on his home, the Court still cannot credibly compare him to these passive suspects.

Plaintiffs have not directed the Court to any case that could be construed as providing fair notice to the DPS Officers that their conduct was clearly unconstitutional—that it is objectively unreasonable to use deadly force on an armed suspect who has refused to cooperate with law

enforcement and has already used deadly force himself on the officers.  Nor has the undersigned been able to identify any case law through independent research that provides even an outline of the contours of a suspect's right to be free from deadly force in a hostage standoff situation like the one this case presents.

Although out-of-circuit precedent is not binding on this Court (nor instructive on what has been "clearly established" in this Circuit), the Court does note that the Sixth Circuit has held that officers employing deadly force on a suspect who had taken his wife and son as hostages in his home were entitled to qualified immunity, where the suspect was an active shooter and therefore unquestionably posed an immediate threat to the officers.  *Ewolski v. City of Brunswick*, 287 F.3d 492, 508 (6th Cir. 2002).  The facts here are distinguishable, in that Plaintiffs allege that Fernando was not engaged in active shooting at the precise time deadly force was employed, but the fact that remains that Fernando had repeatedly used deadly force throughout the course of the standoff and a reasonable officer in the position of the DPS Defendants could have concluded that he generally presented a risk of serious bodily injury to the officers and to his hostage.

Accepting Plaintiffs' allegations as true, the chronology of the police standoff involved a long 15-hour lull in action prior to the arrival of the DPS SWAT team, followed by the exchange of fire between Fernando and Bexar County SWAT officers after the DPS Officers released diversionary devices towards the residence.  Plaintiffs' pleadings therefore allege that at some point in time prior to the DPS Officers' use of the deadly force that ultimately killed Ms. Macias and wounded Fernando, they witnessed Fernando employing deadly force on Bexar County SWAT officers.  If there was a lull in the action before the DPS Officers shot their hundreds of bullets at the residence, Plaintiffs have not pleaded that the lull was significant.

Moreover, there is no precedent suggesting that the DPS Officers were required to parse the timing of Fernando's active resistance against the periods of his passive resistance to determine when it would be reasonable to employ force to seize him.  If the Fourth Amendment indeed requires such an assessment, the contours of this requirement were not sufficiently clear at the time of the events in question, and the undersigned cannot say that a reasonable official would have understood that they could not employ deadly force at the precise moment they did so here.  *See Anderson*, 483 U.S. at 640.

The DPS Officers are therefore entitled to qualified immunity on Plaintiffs' Fourth Amendment excessive force claim.  Because the undersigned finds that the DPS Officers are entitled to qualified immunity, the Court need not consider Defendants' argument that Plaintiffs failed to sufficiently describe the individual conduct of each of the DPS Officers.

iii.      The Court should dismiss Plaintiffs' Fourteenth Amendment claim.

Plaintiffs also allege a Fourteenth Amendment violation against all individually named Defendants in their pleadings, arguing that the DPS Officers violated Ms. Macias's right to substantive due process by depriving her of her right to life.  The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."  Const. Amend. XIV.  The Fourteenth Amendment's due process clause has two components—(1) a guarantee of procedural protections when a state seeks to deprive an individual of protected liberty or property interests, and (2) a substantive protection against conduct that "shocks the conscience."  *Jordan v. Fisher*, 823 F.3d 805, 810 (5th Cir. 2016).

As Plaintiffs do not allege the deprivation of any procedural protections, their due process claim shall be evaluated as an assertion of the violation of Ms. Macias's right to substantive due

process.   This component of the due process clause is triggered when "the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."   *Id.* (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 862 n.8 (1998)).   To prevail on such a claim, Plaintiffs need to demonstrate that the actions of the DPS Officers "were grossly disproportionate to the need for action under the circumstances and were inspired by malice rather than merely careless or unwise excess of zeal . . . that amounted to an abuse of official power that shocks the conscience."   *Petta v. Rivera*, 143 F.3d 895, 902 (5th Cir. 1998).

The DPS Officers argue for dismissal of Plaintiff's due process claim because they believe the only standard through which the Court should view Plaintiffs' constitutional claims in this case is the excessive force standard under the Fourth Amendment.   The undesigned agrees.

There are certain instances in which a claim of excessive force might be cognizable under the Due Process Clause.   However, where a cause of action is available under the specific protections of the Fourth Amendment, as here, a claim that the conduct violated the more generalized right to substantive due process is not available.   *See Graham*, 490 U.S. at 394–95 ("Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.").

If, however, the Court were to find that Plaintiffs failed to allege the seizure of Ms. Macias, for example, the Due Process clause could theoretically provide another avenue of redress.   *See Petta*, 143 F.3d at 910 n.25 ("[W]here a plaintiff's excessive force claim . . . falls outside the specific protections of the Bill of Rights, that plaintiff may still seek redress under the

due process clause of the Fourteenth Amendment.").  Innocent bystander claims are frequently analyzed under the rubric of substantive due process, when a seizure of the victim did not occur, and therefore cannot be the basis of a Fourth Amendment violation.  *See id.*

The DPS Officers also argue that they are entitled to qualified immunity as to this claim, and it is worth noting that Plaintiffs do not address this claim at any point in their response to Defendants' motions to dismiss.  Based on this lack of response, and because the Fourth Amendment provides a specific avenue to redress Plaintiffs' claimed constitutional injuries, Plaintiffs' Fourteenth Amendment claim should be dismissed.

iv.    The Court should dismiss the Section 1983 claims against DPS Director McCraw.

Plaintiffs also allege that DPS Director McCraw failed to train the individual officers under his supervision on the proper means of extracting barricaded subjects, managing hostage situations, working with individuals suffering from mental illness, and deescalating crises, which led directly to the use of excessive force on Ms. Macias.  (Second Am. Compl. [#24] at ¶¶ 83, 90–91.)   McCraw also asserts qualified immunity to Plaintiffs' claims under Section 1983 and argues for the dismissal of this claim.

When the alleged state actor is a supervisor, as here, there must be allegations of the supervisor's personal involvement in the acts causing the deprivation of constitutional rights or there must be a causal connection between the act of the supervisor and the constitutional violation sought to be redressed.  *Gates v. Tex. Dep't of Protective and Regulatory Servs.*, 537 F.3d 404, 435 (5th Cir. 2008); *Anderson v. Pasadena Indep. Sch. Dist.*, 184 F.3d 439, 443 (5th Cir. 1999).  There is no vicarious or *respondeat superior* liability of supervisors under Section 1983.  *Rios v. City of Del Rio, Tex.*, 444 F.3d 417, 425 (5th Cir. 2006); *accord Carnaby v. City of Houston*, 636 F.3d 183, 189 (5th Cir. 2011) (holding that under Section 1983, "a government

official can be held liable only for his own misconduct").  The only allegations against McCraw relate to his failure to train and supervise his subordinate officers.  There is no assertion that McCraw was directly involved in the use of force on Ms. Macias.

There are two ways, however, a supervisor may still be held individually liable for the unconstitutional acts of a subordinate without directly participating in the alleged injury: (1) where the supervisor enacted an unconstitutional policy that resulted in the injury; or (2) where the supervisor's failure to supervise or train a subordinate caused the violation and that failure to train amounted to deliberate indifference.  *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) *Goodman v. Harris County*, 571 F.3d 388, 395 (5th Cir. 2009).  Even if Plaintiffs established a Fourth or Fourteenth Amendment violation by the DPS Officers, Plaintiffs have not alleged facts sufficient to show that McCraw did either.

"To satisfy the deliberate indifference prong, a plaintiff must usually demonstrate a pattern of violations and that the adequacy of the training [or supervision] is obvious and obviously likely to result in a constitutional violation."  *Cousin v. Small*, 325 F.3d 627, 637 (5th Cir. 2002) (internal citations omitted).  A single incident is usually insufficient to show deliberate indifference.  *Estate of Davis ex re. McCully v. City of North Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005).  Plaintiff has not alleged any facts related to previous incidences involving the DPS SWAT team and hostage situations or armed standoffs with mentally ill subjects.  Plaintiffs also do nothing more than allege in a conclusory fashion that McCraw enacted defective training policies.  (Second Am. Compl. [#24] at ¶ 90.)  Plaintiffs have failed to plead facts that show a violation of any constitutional right based on McCraw's failure to train or supervise his officers, and this claim should be dismissed.

v.      Plaintiffs' Section 1983 claims against the DFPS Defendants sued in their
individual capacities should be dismissed.

DFPS Commissioner Whitman and DFPS employees Weimer and Cornevin also invoke

qualified immunity as to Plaintiffs' Section 1983 claims asserted against them in their individual

capacities.[4]   Plaintiffs' Section 1983 claims as to the DFPS Defendants are not based on

allegations of excessive force but on the failure of Whitman and Weimer to train and supervise

subordinate employees responsible for managing Ms. Macias's case and responding to calls for

help by her family members.  (Second Am. Compl. [#24] at ¶¶ at 82–93.)  The only allegations

related to Cornevin are that she was the employee who closed Ms. Macias's case at the

instruction of Weimer, her supervisor.  (*Id.* at ¶ 16.)  Plaintiffs pursue their claims against these

individual defendants under the Fourteenth Amendment, alleging a denial of due process.

Again, Plaintiffs' pleadings do not specify whether they are asserting a claim under the

procedural or substantive components of the Due Process Clause, but their response to

Defendants' motions to dismiss discusses both types of claims.  Whitman and Weimer argue that

Plaintiff have failed to allege either a violation of procedural or substantive due process.  As to a

procedural due process claim, Whitman and Weimer argue that Plaintiffs have failed to establish

that Macias had any liberty or property interest in her Adult Protective Services case remaining

open.  Moreover, they argue that allegations related to the failure to return calls, keep Macias's

case open, or remove Macias from Fernando's care are best categorized as "failure to protect"

claims that do not constitute a violation of the substantive component of the Due Process Clause

under *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189 (1989).

---

[4] DFPS Director Wold is also sued in his individual capacity but, like Evans, has not been
served and is therefore not a party to the motions to dismiss before the Court.

*DeShaney* involved a case against a county social services department for the failure to remove a child from his father's custody after receiving complaints that the child was the victim of abuse.  489 U.S. at 191.  The child was not removed and was permanently injured.  *Id.*  The mother of the boy sued the department, claiming that its failure to act had deprived the boy of his liberty in violation of the Due Process Clause of the Fourteenth Amendment.  *Id.*  The Supreme Court affirmed the lower court's grant of summary judgment to the department, construing the claim as invoking the substantive rather than procedural component of the Amendment and concluding that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."  *Id.* at 197.  The Court further emphasized that the Court's precedents also establish that the Due Process Clause does not confer any "affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual."  *Id.* at 196.  "If the Due Process Clause does not require the State to provide its citizens with particular protective services, it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them."  *Id.* at 196–97.

In reaching this conclusion, the Supreme Court rejected the argument that the State acquired an affirmative duty to protect the boy because of a "special relationship" between the parties.  *Id.* at 197–98.  The Court reasoned that such a duty arises only when the State takes a person into its custody and holds him there against his will, and thus has a corresponding duty for the individual's safety and wellbeing.  *Id.* at 199–200 ("In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty— which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its

failure to act to protect his liberty interests against harms inflicted by other means.").   There is one other exception to the general principle stated in *DeShaney*—when the State exposes a person to danger of its own creation.  *Piotrowski v. City of Houston*, 237 F.3d 567, 583 (5th Cir. 2001).   Neither a special relationship nor a state-created danger has been alleged here.

Plaintiffs do not address *DeShaney* in their response to Defendants' motions.  Even if *DeShaney* were not applicable to the facts at hand, because, for example, the injury suffered by Ms. Macias was inflicted not by a private individual, but by a state officer (albeit a different one than the DFPS employees alleged to have failed at protecting her from danger), Plaintiffs still have failed to plead that the alleged conduct of the DFPS Defendants in failing to respond to calls regarding Ms. Macias's safety and in closing Ms. Macias's case was conduct so egregious as to rise to the level required to shock the conscience and state a constitutional deprivation.

Nor can Plaintiffs show a property interest in DFPS's care and a constitutional right to certain procedural protections—such as notice and an opportunity to be heard—before her case was closed.  "[N]ot all government benefits programs create constitutionally recognized property interests." *Ridgely v. Fed. Emergency Mgmt. Agency*, 512 F.3d 727, 735 (5th Cir. 2008).  And the "mere existence of a governmental program . . .  does not give a plaintiff a property right, protected by the due process clause, to receive the benefit, absent some legitimate claim of entitlement—arising from statute, regulation, contract, or the like—to the benefit." *Blackburn v. City of Marshall*, 42 F.3d 925, 941 (5th Cir. 1995).

Plaintiffs cite to various provisions of the Texas Human Resources Code in an attempt to establish Ms. Macias's entitlement to the continued care of DFPS.  *See* Tex. Hum. Res. Code §§ 48.004, 48.152.  To determine whether statutes or regulations create a protected property interest, a court asks whether they place "substantive limitations on official discretion." *Ridgely*, 512

38

F.3d at 735 (quoting *Olim v. Wakinekona*, 461 U.S. 238, 249 (1983)).  The sections of the Texas

Human Resources Code cited by Plaintiffs do not.  Section 48.004 merely directs the executive

commissioner to develop and maintain risk assessment criteria to be used in determining whether

an elderly person with a disability is in imminent risk of abuse or neglect and lists the various

factors to be considered in making such an assessment.  Tex. Hum. Res. Code § 48.004.  Section

48.152 addresses the process of interviewing the elderly person alleged to be at risk of abuse and

any other person the department deems necessary.  *Id.* at § 48.152.  Yes, it is possible that risk

assessment criteria might not have been developed or properly considered in responding to

reports of Fernando's delusions and concerns about Ms. Macias's safety.  But even if that were

true, that does not mean Plaintiffs have demonstrated that Ms. Macias was entitled to the

continued care of DFPS or any specific process before her case was closed, which is what is

required to that implicate the Due Process Clause of the Constitution.

 And, as with DPS Director McCraw, even if Plaintiffs had alleged facts sufficient to

demonstrate a violation of a clearly established constitutional right under the Due Process

Clause, their failure to train and supervise theories fail as well.  Again, to sustain their claims of

failure to train or supervise against DFPS Commissioner Whitman and DFPS employees Weimer

and Cornevin, Plaintiffs must allege either (1) that these supervisors enacted an unconstitutional

policy that resulted in the injury or (2) that their failure to train or supervise amounted to

deliberate indifference and caused Ms. Macias's constitutional injury.  *See Porter*, 659 F.3d at

446.  Plaintiffs' response to the DFPS Defendants' arguments regarding the failure to train

claims argues that DFPS "maintained a widespread practice or custom of failing to train or

supervise their employees," which is "evidenced by the thousands of calls that go

unacknowledged by the department each year," as well as "lack of proper investigation into abuse and neglect reports, and case closures without notice." (Resp. [#29] at 16.)

Plaintiffs cite two 2018 news stories from the Austin American Statesman and the Texas Tribune reporting on the understaffing of DFPS, the increased workloads of caseworkers, high staff turnover, the long hold times callers face, and the large volume of abandoned calls as a result. *See* https://www.statesman.com/news/20180330/as-wait-times-grow-calls-to-the-texas-abuse-hotline-go-unanswered (last visited Feb. 8, 2021). The stories focus on inadequate funding of the agency and a request to the Texas Legislature to approve funding for worker raises to help attract and retain caseworkers. *See* https://www.texastribune.org/2018/10/09/texas-cps-aps-forgotten-caseworkers-legislators/ (last visited Feb. 8, 2021). These articles, while identifying structural issues with DFPS as an agency, do not support Plaintiffs' conclusory allegation that DFPS had a widespread practice or custom of failing to train or supervise their employees in investigating abuse or neglect.

Plaintiffs have not alleged a pattern or practice of DFPS to ignore reports of abuse or neglect or to prematurely close cases rather than investigate them from which deliberate indifference could be inferred. *Cousin*, 325 F.3d at 637. Plaintiffs have also not alleged or identified any specific policy that any of these Defendants enacted that was the cause of the injuries at issue in this case. *See id.* The only specific allegations regarding DFPS's failure to respond to Plaintiffs' pleas for help is that Weimer directed Cornevin to close Ms. Macias's case. Plaintiffs have "not made any attempt to allege a pattern of similar 'violations' by [Weimer,]" or any other supervisor at DFPS, an omission that is "fatal" to their failure to supervise claims under Section 1983. *See Mesa v. Prejean*, 543 F.3d 264, 275 (5th Cir. 2008) (affirming

summary judgment in favor of officer as to excessive force claims based on a failure to supervise).

In summary, because Plaintiffs have failed to cite any policy or program of DFPS supporting their allegations regarding the failure to train DFPS employees and have failed to plead a pattern or practice of ignoring reports of abuse or neglect, the DFPS Defendants (Whitman, Weimer, and Cornevin) are also entitled to dismissal of Plaintiffs' Section 1983 claims based on a failure to train or supervise.

vi.   Plaintiffs should not be given another opportunity to replead prior to dismissal of their Section 1983 claims.

Generally, courts should give a plaintiff at least one opportunity to cure any pleading deficiencies before dismissing a case under Rule 12(b)(6). *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002). However, it is not an abuse of discretion to grant a motion to dismiss without ordering further pleading where a plaintiff has not requested further amendment and has repeatedly urged the sufficiency of the pleadings throughout her filings. *See Alsenz v. Aurora Bank, FSB*, 641 Fed. App'x 359, 363 (5th Cir. 2016); *Brewster v. Dretke*, 587 F.3d 764, 768 (5th Cir. 2009).

Here, Plaintiffs amended their pleadings as a matter of course upon the removal of this case to federal court. (First Am. Complaint [#8].) The Court subsequently gave Plaintiffs one additional opportunity to amend their pleadings. (Order [#20].) Although the Court's Order regarding that amendment focused on the importance of Plaintiffs clarifying the identity of the various Defendants, several motions to dismiss had already been filed at the time of the ordered amendment, which had raised the pleading deficiencies and immunity issues discussed herein. Plaintiffs were therefore on notice as to the possible legal issues and defenses that could prove fatal to their claims but chose not to amend their factual allegations in response to the alleged

deficiencies.   Additionally, and importantly, Plaintiffs' responses to the various motions to dismiss on file do not request the opportunity to file a third amended complaint.  These responses also consistently emphasize the sufficiency of the pleadings, evidencing Plaintiffs' belief that they already pleaded their "best case."  *See Brewer*, 587 F.3d at 768.  Under these circumstances, the District Court need not provide Plaintiffs with another opportunity to plead facts sufficient to overcome Defendants' qualified immunity defense or to state their various claims and theories under Section 1983.

**D.     Tort Claims**

Plaintiffs' Second Amended Complaint pleads claims under Texas's Wrongful Death and Survival Statutes, as well as claims of negligence and gross negligence, alleging that DPS and DFPS had a duty of reasonable care to protected Ms. Macias from harm and failed to do so, by failing to conduct a proper investigation into Plaintiffs' reports of danger and recklessly and indiscriminately shooting at Ms. Macias's residence without attempting to protect her.  (Second Am. Compl. [#24] at 16–18.)  Defendants argue that they enjoy sovereign immunity as to those tort claims asserted against them in their official capacities and invoke the election-of-remedies doctrine as to the tort claims asserted against them in their individual capacities.

Although these immunities and doctrines might ultimately be fatal to Plaintiffs' tort claims, the undersigned will not address them here.  If the Court accepts the undersigned's recommendation and dismisses all of Plaintiffs' Section 1983 claims, the Court should decline to maintain supplemental jurisdiction over Plaintiffs' tort claims and instead remand them to the state court for further proceedings.

This Court has jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367(c), which provides for supplemental jurisdiction "over all other claims that are so related to

claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." This Court has original federal question jurisdiction over this lawsuit pursuant 28 U.S.C. § 1331 based on Plaintiffs' pleading of federal claims in this action. But if the District Court accepts the undersigned's recommendation to dismiss Plaintiffs' constitutional claims arising under Section 1983, there will be no federal question remaining before the Court. Diversity jurisdiction under 28 U.S.C. § 1332 does not exist in this case because the parties are all citizens of Texas.

If the Court dismisses Plaintiffs' Section 1983 claims, the District Court would have discretion to follow the "general rule" in this Circuit and decline to exercise supplemental jurisdiction over Plaintiffs' remaining tort claims. See 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . (3) the district court has dismissed all claims over which it has original jurisdiction."). In determining whether a district court abused its discretion in dismissing or remanding remaining state-law claims, the Fifth Circuit considers both the statutory provisions of Section 1367(c) and the balance of the relevant factors of judicial economy, convenience, fairness, and comity that the Supreme Court outlined in *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350–51 (1988) and *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966). *Batiste v. Island Records, Inc.*, 179 F.3d 217, 227 (5th Cir. 1999) (holding district court abused its discretion by declining to exercise supplemental jurisdiction over pendent state law claims where trial was scheduled to occur in only one month and case had been pending for three years).

As this case is only in the early stages of its proceedings and no discovery has yet taken place, and because the state court is well-suited to decide these matters of state law, the District

Court should remand the remaining state-law claims to the 407th Judicial District Court of Bexar County, Texas.

**E.**     **Service of Process Issues**

Defendant Crystalynn Nichole Cornevin's motion to dismiss raises one additional issue not addressed by Defendants in any other motion—the issue of improper service of process.  She argues that Plaintiffs failed to serve her under governing federal or Texas service rules because the return receipt of the summons did not include her signature.  The Court need not address this issue, because it has already determined that the Section 1983 claims asserted against Cornevin as a DFPS employee should be dismissed based on the various pleading defects raised by Defendants.  The Court will leave the question of whether she was properly served under Texas law and the potential need for reservice of Cornevin to the state court upon remand.

As previously noted, there are also two Defendants who have not yet been served—DFPS Director Wold and DPS Officer Evans.  On June 24, 2020, the Court ordered Plaintiffs to effectuate service on any newly named and unserved Defendants within 90 days of the filing of Plaintiffs' Second Amended Complaint in accordance with Rule 4(m) of the Federal Rules of Civil Procedure [#20].  The Court ordered that any previously named yet unserved Defendant be served within 14 days of the filing of Plaintiffs' amended pleading.  Evans was named in Plaintiffs' First Amended Complaint and therefore should have been served by August 8, 2020.  Regardless, the 90-day period for service of new Defendants expired on September 29, 2020, and there is no evidence in the record that either Wold or Evans has been served.

At this point in this case, allowing additional time for their service would be futile, as least in terms of the federal claims.  *See* Fed. R. Civ. P. 4(m) (allowing extension of time for service upon showing of "good cause").  DFPS Director Wold is accused of failing to train DFPS

employees, the same conduct alleged against Commissioner Whitman and DFPS supervisor Weimer.  There are no additional allegations unique to Wold that would somehow distinguish him from the other DFPS Defendants and lead the Court to reach a different conclusion regarding the jurisdictional and immunity issues raised in Defendants' motions to dismiss.  DPS Evans is one of the DPS SWAT team officers accused of violating Ms. Macias's constitutional rights during the shootout with Fernando.  There are also no additional allegations unique to Evans that would lead the Court to reach a different result as to Plaintiffs' constitutional claims asserted against him.

Plaintiffs' Section 1983 claims against these Defendants should therefore be dismissed for failure to timely effectuate service of process and for failure to prosecute.  *See* Fed. R. Civ. P. 4(m) ("If a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against the defendant or order that service be made within a specified time.").  Plaintiffs will have the opportunity to raise any arguments regarding good cause for an extension of time to serve Wold and Evans before the state court.  Finally, if these two Defendants have been served but for some reason proof of service was not submitted to the Court, the Court should nonetheless *sua sponte* dismiss Plaintiffs' Section 1983 claims against them for the reasons set forth in this recommendation.

### IV.  Conclusion and Recommendation

Having considered Defendants' motions, the responses and replies thereto, the live pleadings, and the governing law, the undersigned **recommends** that Defendants' Motion to Dismiss for Lack of Capacity or, in the Alternative, for Failure to Join Necessary Parties [#9] be **DISMISSED WITHOUT PREJUDICE** to refiling in state court following remand.  The

undersigned further **recommends** that Defendants' Motions to Dismiss [#11, #12, #26, #41, #42, #43] be **GRANTED IN PART** as follows:

- The District Court should find that Plaintiffs have standing to assert their various claims against the DFPS Defendants but lack standing to pursue their requested injunctive relief.

- The District Court should dismiss Plaintiffs' Section 1983 claims against DPS, DFPS, and any Defendant sued in an official capacity because these Defendants are not "persons" subject to suit under Section 1983.

- The District Court should conclude that although Plaintiffs' have pleaded a plausible Fourth Amendment violation against the DPS Officer Defendants sued in their individual capacities pursuant to Section 1983, these Defendants are nonetheless entitled to qualified immunity.

- The District Court should dismiss Plaintiffs' Section 1983 claim against the DPS Officer Defendants arising under the Fourteenth Amendment for a violation of substantive due process because the Fourth Amendment provides a specific avenue to redress Plaintiffs' claimed constitutional injuries.

- The District Court should dismiss Plaintiffs' Section 1983 claim against DPS Director Steven McCraw because Plaintiffs have failed to plead a claim based on McCraw's failure to train or supervise his subordinates.

- The District Court should dismiss Plaintiffs' Section 1983 claims against DFPS Defendants Whitman, Weimer, and Cornevin because Plaintiffs have failed to plead a claim based on these Defendants' failure to train or supervise their subordinates.

The undesigned also recommends that the District Court *sua sponte* dismiss Plaintiffs' Section 1983 claims against Defendants DFPS Director Kez Wold and DPS Officer Jason Evans for failure to prosecute.  After dismissing all of Plaintiffs' federal claims, the District Court should **remand** Plaintiffs' state-law claims (wrongful death, survivorship, negligence, and gross negligence) to the 407th Judicial District Court of Bexar County, Texas.

### V.  Instructions for Service and Notice of Right to Object/Appeal

The United States District Clerk shall serve a copy of this report and recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as

a "filing user" with the clerk of court, or (2) by mailing a copy to those not registered by certified mail, return receipt requested.  Written objections to this report and recommendation must be filed **within fourteen (14) days** after being served with a copy of same, unless this time period is modified by the district court.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  The party shall file the objections with the Clerk of Court and serve the objections on all other parties.  A party filing objections must specifically identify those findings, conclusions or recommendations to which objections are being made and the basis for such objections; the district court need not consider frivolous, conclusive or general objections.  A party's failure to file written objections to the proposed findings, conclusions and recommendations contained in this report shall bar the party from a *de novo* determination by the district court.  *Thomas v. Arn*, 474 U.S. 140, 149–52 (1985); *Acuña v. Brown & Root*, *Inc.,* 200 F.3d 335, 340 (5th Cir. 2000).  Additionally, failure to file timely written objections to the proposed findings, conclusions and recommendations contained in this report and recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the un-objected-to proposed factual findings and legal conclusions accepted by the district court.  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

SIGNED this 9th day of February, 2021.

ELIZABETH S. ("BETSY") CHESTNEY
UNITED STATES MAGISTRATE JUDGE